IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>    v. )<br>)<br>NATHANIEL POWELL, )<br>    a/k/a "Nate" )<br>)<br>    Defendant. ) | Criminal No. 2:16cr97-002 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, John F. Butler, Special Assistant United States Attorney, and Andrew C. Bosse and Joseph E. DePadilla, Assistant United States Attorneys, hereby submits its position with respect to the defendant's sentencing factors. In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable advisory guidelines range to be a term of 360 to 480 months' imprisonment (Offense Level 37 and Criminal History Category VI). PSR ¶ 104. In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and consulted with the Probation Office and with defense counsel. The United States does not dispute any of the sentencing factors set forth in the PSR or the guidelines range calculation. The defendant objects to the enhancements related to drug weight, maintaining a premise, firearms, threats, and obstruction, all of which are discussed in Section III below.

After considering each of the 18 U.S.C. § 3553(a) factors, the PSR, this defendant's criminal record, and the defendant's aggravated, deplorable, and continued criminal conduct, the

United States respectfully submits that a sentence of at least 360 months is appropriate and warranted.

I.  **Motion**

The United States moves this Court, pursuant to U.S.S.G. § 3E1.1(b) and based upon the terms of the binding plea agreement in this case, to grant an additional one-level reduction in the defendant's offense level for acceptance of responsibility.  The defendant timely notified the United States of his intention to enter a plea of guilty, thereby allowing the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

II. **Background**

On July 20, 2016, the defendant and his four co-defendants were charged in a 20-count indictment arising out of a conspiracy to manufacture, distribute, and possess with intent to distribute heroin (Count 1).  The defendant was also charged in Count Eleven for possession with the intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  The defendant pleaded guilty on October 20, 2016, and is scheduled to appear before this Court for sentencing on March 30, 2017.

III. **Objections**

a. **Drug Weight**

The PSR calculated the aggregate drug weight attributable to the defendant at over one kilogram of heroin.  PSR ¶¶ 10, 19.  The drug weight attributed to the defendant came in large part from information provided by one of the co-defendants, who provided information about her role in the conspiracy before she was federally indicted.  PSR ¶ 10.  In addition to a dozen transactions she had with the defendant, she also described one occasion where the defendant

received a kilogram of heroin. She described hearing how he began using a blender or coffee grinder to breakdown the product from its original packaging. Additionally, the defendant agreed in his statement of facts that the drug weight was in excess of 100 grams of heroin. Finally, as noted in paragraph 11 of the PSR, the defendant was interviewed by the Probation Office and admitted to making wholesale purchases of heroin from sources of supply in Baltimore. He described purchasing 100 grams of heroin and selling it in ½ ounce or 1 ounce quantities. He also described a joint purchase with co-conspirator Gordon, in which they pooled together $17,200 to purchase of 200 grams of heroin.

The defendant does not deny supplying heroin to his co-conspirator, purchasing wholesale amounts with another co-conspirator, or distributing heroin to others. Instead, the defendant's sole claim is that the kilogram of heroin described in paragraph 10 of the PSR is either exaggerated or not credible. "[A] mere objection to the finding in the presentence report is not sufficient." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). "The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *Id.* Without providing more specific information about why the heroin described is not credible, especially in light of the fact that this defendant was a wholesale trafficker of heroin for multiple years, the defendant has not met that burden here. The defense has neither given the Court sufficient reason to determine that a lower guidelines range should apply nor given the government sufficient information to re-evaluate any of the attributed drug weights. Without more, the objection should be denied.

The defendant, of course, is free to testify to fulfill his affirmative duty to show the PSR's drug weight calculation is unreliable. If he does testify, he will be subjected to cross-

examination, including about the statements he made in his own debrief. If necessary, the government is prepared to call DEA Task Force Officer Rob Dyer, who had the opportunity to debrief the defendant's other co-conspirators and who can testify about drug weights attributed to the defendant. But before that happens, the defendant should be required to make at least some showing that the drug weight attributed to him is inaccurate or unreliable. His mere say-so, through his attorney, is not enough.

    b.  Firearm Enhancement

Like the drug weight, the defendant is also objecting to the firearm enhancement without providing a basis for that objection. As cited above, an objection is not sufficient without affirmatively showing that the finding is unreliable.

This enhancement was applied because one of the defendant's co-conspirators, Valerie Wilson, told investigators how she observed the defendant with a firearm on almost every occasion on which she purchased heroin from him and that the defendant always sat on one or two firearms in his wheel chair. She reported that the defendant (who is also the uncle of Wilson's niece) may have possessed a 9mm, but was unclear on the exact model. Wilson told investigators that she stopped dealing with the defendant because he was acting "crazy" and "violent." The fact that Wilson did not provide the exact date on which she observed the firearm does not make her claim any less credible. This woman dealt with the defendant over a five-year period. It would be unusual to remember the twelve occasions on which she observed the firearm over such a long period. The defendant's objection is not sufficient to undermine the credibility of Wilson's statement and should therefore be overruled. Again, the defendant is free to take the stand to tell the Court he did not use a gun during the conspiracy. If he does so, the government is prepared to present evidence that there were others in addition to Wilson who

observed the defendant with a firearm. But it should not have to do so without something more than the general objection lodged by the defendant.

    c. Maintaining a Premises

Section 2D1.1(b)(1) of the USSG states, "If the defendant maintained a premises for the purposes of manufacturing or distributing a controlled substance, increase [the offense level] by 2 levels." Section 856(a)(1) of Title 21 of the United States Code provides in part that:

> It shall be unlawful to knowingly open, lease, rent, *use*, or *maintain* any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance.

Emphasis added.

Where the premises in question is a residence, a defendant must have a substantial connection to the residence and must be more than a casual visitor to qualify for the enhancement. It is not necessary that the defendant lease or own the premises. Acts that evidence "maintenance" are such matters as control of the site, the amount of time spent in the site, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, or supplying food to the site, and continuity of use. *See United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990); *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010) (citing *United States v. Clavis*, 956 F.2d 1079, 1091 (11th Cir. 1992)). Surely the fact that the defendant used his Portsmouth residence over a five-year period is sufficient to establish continuity of use. The question, then, is whether the defendant used the residence for the purpose of manufacturing, distributing, or using heroin.

That question is answered in paragraph 10 of the PSR. Wilson, who is related to the defendant, visited the defendant's home on Gateway Drive in the Churchland section of Portsmouth on a dozen occasions since the summer of 2011 to purchase heroin. On one occasion she observed the defendant take possession of a kilogram of heroin at his home, which he then

proceeded to process for retail distribution. Wilson overheard Powell cut the wholesale heroin with a blender or coffee grinder.

Wilson does not describe a onetime association with Powell. Powell was her source of supply and they had a series of heroin transactions since the summer of 2011 that took place at or around the same residence. Using a residence to manufacture and distribute heroin as the defendant did is exactly the kind of aggravation § 2D1.1(b)(12) was designed to address.

    d. <u>Communicating a Threat and Obstruction of Justice</u>

The defendant objects to enhancements for communicating a threat and for obstruction of justice. He seems to suggest that, because the underlying evidence is from the same source – a Facebook message – both enhancements are unfairly applied. That is not correct. The content of the message contains a threat and it seeks to impede the administration of justice.

To the extent the defendant attempts to rely at sentencing on *United States v. Jones*, 716 F.3d 851 (4th Cir. 2013), that case—which dealt with marriage fraud—is not applicable here. *Jones* challenged the district court's calculation of the advisory sentencing range as it pertained to the grouping of multiple obstruction of justice convictions. In the instant case, we are dealing with an obstruction of justice enhancement, not an underlying conviction for obstruction.

The Sentencing Guidelines were designed in part to prevent "double counting" that would occur if a district court applied both a base offense level and an enhancement for the same conduct. *See* U.S.S.G. § 3D1.2 cmt. n.5. That did not happen here. The two enhancements that were applied based on the Facebook message are distinguishable –one is for communicating a threat –actually, numerous threats (*e.g.*, "to fix ur ass"; "Don't find yourself on a t-shirt" (it is tradition among some to print the deceased's image on a t-shirt, *i.e.*, an "RIP shirt," to mourn their loss); "I know wea u rest ur head"; "if you want [*i.e.*, "weren't"] 12 I would have been sent

6

the lurkers" ("12" commonly refers to the police or to a someone assisting the police – in this context it appears the defendant was stating that if the target of this threat was not with the police, he would have sent someone to hurt and or kill him); "stop playing my nicca before I lose my morals and involve ppl u love nicca."). *See* Government Exhibit 2.

The message *also* contains content specifically designed to intimidate the target of the message from participating in the investigation or assisting law enforcement (*e.g.*, telling "fbf" (Facebook friends) that a particular individual is a police informant and stating, "no way in hell I'm gone let you set me up"; "stop playing"). *Id*. Other than communicating threats to harm his intended target and the people he loves, the defendant was also seeking to "out" this particular person whom he believes is working with police to those on his social media network. This kind of intimidation is exactly the kind of conduct U.S.S.G. § 3C1.1 is designed to address. If the target of the defendant's message were in fact a confidential informant, this type of communication could easily derail the administration of justice. Pressuring people not to cooperate with the government is obviously obstructive conduct that threatens the ability of the police and prosecutors to do their jobs. As a general matter, law enforcement relies on individuals in the community who know about crime to cooperate in solving it. This case itself shows the importance of confidential witness cooperation. Without the help of the CI who conducted the controlled purchase charged in Count 11, the government would not have been able to charge that heroin sale.

Finally, even if the court were inclined to agree with the defense and not apply the obstruction of justice enhancement for that particular set of Facebook posts, the government notes that the defendant was involved in other obstructive behavior that would merit the enhancement.

After the indictment, the defendant sent three letters to co-conspirator, Detaun Gordon, while both of them were in custody in Western Tidewater Regional Jail.  *See* Government Exhibit 1.  The defendant sought to impede the administration of justice by encouraging Mr. Gordon to tell him what he had told law enforcement so that the defendant knew what he was "walking into" with respect to drug weight (e.g. "I'm trying to figure out what you told the people about me…I know you been debriefed;" "Play fair and don't put no weight on them;" "I just want to know how much weight he put on me.  I'm facing 40 *ucking years myself.  If he don't want to tell me I got to do what I got to do.").  In what looks to be a signature move, the defendant here as well mixed a threat into the attempt at obstruction: "My shots not gone miss either so make your next words count my boy."

### IV. Position on Sentencing and Argument

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process.  First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).  "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)).  In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

>  A) <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are especially serious for several reasons. First, the defendant was engaged in a long-term conspiracy to distribute heroin, which lasted more than four years. Second, in addition to the length of the conspiracy, this defendant, because of his role as a supplier to other members of the group, was one of the two most culpable conspirators. While he was not assessed an enhancement for his role, which involved supplying a drug trafficking organization of five or more members, he was one of two individuals who procured heroin and fentanyl from sources of supply in Baltimore. He repackaged those wholesale amounts for retail sales in the Hampton Roads region and supplied at least one other member of the group who further disseminated this poison to nearly two dozen individuals in North Carolina.

Third, unlike his co-conspirator Detuan Gordon, this defendant was also known for his violence. He threatened multiple people and continued his threats even after pleading guilty. The United States highlighted the Facebook threats the defendant made at his detention hearing. Even after knowing that the government was monitoring his behavior, he persisted with his campaign to intimidate witnesses and obstruct justice by threatening his co-conspirator in a series of jail letters. While it is unlikely that the defendant himself could have shot his co-defendant while both were in custody—as he threatened—the Court is well aware that local jails are not immune from violence, and that inmates sometimes order violent actions against fellow inmates. Even putting aside the very real threat of danger, the threats are indicative of the mindset of this defendant. This is a man determined to hurt and threaten people even in the face of the consequences associated with this impending sentencing hearing.

On May 26, 2016, law enforcement coordinated a controlled purchase of heroin through the use of a confidential informant. When the defendant realized something was amiss, he led officers on a high-speed chase, with estimated speeds upwards of 70 miles per hour, through residential neighborhoods in the middle of the day. *See* Government Exhibit 3.[1] He did not stop by choice—the chase ended only because he crashed into another vehicle. The victim from the other vehicle sustained injuries and was taken to the hospital. The defendant's actions bespeak a complete disregard for the lives of others.

This defendant is in a wheelchair because of a car accident in 2007 that left him paralyzed from the waist down. This accident was also the result of an attempt to elude police while in possession of narcotics; the defendant crashed his car during that incident, as well. PSR ¶ 48. This is someone who knows the dangers associated with (1) selling drugs; (2) eluding police; and (3) driving recklessly, yet who under similar circumstances again chose to lead law enforcement on a high-speed chase. This one was even more reckless, in fact, because the defendant was using a cane to depress both the accelerator and brake.

    B)    <u>History and Characteristics of the Defendant</u>

        i. <u>Criminal History</u>

The defendant's deplorable criminal history paints the picture of a man who is resolute in his defiance of the law. It also demonstrates a history of violence, reckless endangerment of others, and cruelty towards women. If a Criminal History Category VII existed, he would be in it with his 16 criminal history points. The severity of his criminal history is even more significant when one considers that eleven (11) of his convictions did not even result in criminal

---

[1] Government Exhibit 3 is a three minute video of the pursuit that the government intends to play at the sentencing hearing.

history points. The defendant has demonstrated time and time again that he will not stop committing crimes.

The defendant racked up more than two dozen convictions, including six for narcotics, five for suspended licenses, two for obstruction of justice, two for eluding police, two for failing to appear, two for contempt of court, and for conduct involving violence against two different women. The facts underlying his assault convictions are disturbing. The defendant assaulted one woman in 2006 and 2007, and then in 2012 he was convicted of unlawful wounding. The fact that the defendant is bound to a wheelchair should not disguise his capacity for violence. In June 2012, he ripped his girlfriend out of a parked car and began attacking her with a kitchen knife. His vicious attack left her with lacerations on her face, left arm, and right hand, which required medical treatment and stitches.

On two occasions, he had narcotic charges reduced from possession with intent to distribute to simple possession. PSR ¶¶ 33, 41. These second chances did nothing to deter the defendant, as confirmed by the fact that he stacked up four more possession charges. The defendant had his opportunity to turn his life around. He had second chance after second chance. Now he must face the consequences of his determination to disrespect the law, poison the community, and harm others.

The defendant was under a criminal justice sentence throughout the course of this conspiracy, but that meant nothing to him. He has not only failed to stop committing new crimes while under supervision—he also did poorly complying with the basics. One adjustment period characterized unsatisfactory involved positive tests for cocaine, failure to report, failure to complete treatment, and absconding. PSR ¶¶ 41, 55.

From the possession of firearms, to the violent end of a police chase in this case, to the assaults and new threats to kill after his arrest here, the government is left with the unmistakable conclusion that this defendant is dangerous, violent, and a threat to the public. The only place he will stop committing crimes against the public is in prison.

### ii. Personal Data

The defendant was raised in a two-parent home until his parents separated when he was about 15 years old, at which time his maternal grandparents cared for him. He dropped out of high school in the tenth grade, but completed his GED at the age of 30. His mother had a history of drug use. His family life was marred by violence. One of the defendant's brothers was killed in 2000, and his other brother is in the Department of Corrections serving a sentence for murder.

The defendant has never been married, but has three biological children. He had his first child when he was 18. The defendant did not file tax returns in 2012 or 2015, but when he did, he listed income from a car detailing business. He receives monthly disability checks ($659.70) from the Social Security Administration from the crash that resulted from his eluding police in 2007.

### C) Other Factors to be Considered Under Section 3553(a)

While each factor under 18 U.S.C. § 3553(a) must be considered in fashioning an appropriate sentence, the United States highlights the need to promote respect for the law, to safeguard the community from this defendant's dangerous narcotics and his violent tendencies, and to specifically deter the defendant from continuing his life of crime.

The United States is also mindful to guard against disparity of sentences in a conspiracy case. With that said, the United States contends that this defendant is the most dangerous of the five charged conspirators. Given his criminal history, flagrant disregard for the administration of

justice, and criminal offense level, the government submits that a significant sentence well beyond what his co-conspirators received is warranted.

The following sentences and advisory guidelines apply:

| Defendant | Guidelines | Sentence |
|---|---|---|
| Detaun Gordon | 235-293, plus 60 months consecutive (34/V) | 295 months |
| **Nathaniel Powell** | **360-480 (37/VI)** | |
| Ernest Cross | 70-87 (25/III) | 60 months |
| Marque Wilson | 30-37 (15/IV) | 72 months |
| Valerie Wilson | 151-188 (31/IV) | 70 months |

## V.     Conclusion

The Section 3553(a) factors, including the circumstances of the defendant's leadership role in the offense, the presence of a firearm, his deplorable criminal history, and his brazen threats and obstruction all weigh in favor of a sentence within the advisory guidelines range and in excess of 360 months. The need to promote respect for the law, protect the community from the defendant, to specifically deter him from continuing to commit new crimes, and to address the aggravating and long-term nature of the defendant's role in the conspiracy make a guideline sentence appropriate and not greater than necessary to accomplish the goals of 18 U.S.C. § 3553(a).

        Respectfully submitted,

        Dana J. Boente
        United States Attorney

By:     /s/
        John F. Butler
        Special Assistant United States Attorney
        Andrew C. Bosse
        Joseph E. DePadilla
        Assistant United States Attorneys
        Attorneys for the United States
        United States Attorney's Office
        101 West Main Street, Suite 8000
        Norfolk, VA 23510
        Office Number: 757-441-6331
        Facsimile Number: 757-441-6689
        john.f.butler@usdoj.gov
        andrew.bosse@usdoj.gov
        joe.depadilla@usdoj.gov

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on this 24th day of March, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

      I HEREBY CERTIFY that on this 24th day of March, 2017, I sent by electronic mail a true and correct copy of the foregoing to the following:

      Anita Powell
      United States Probation Officer
      827 Diligence Drive
      Newport News, Virginia 23606

          /s/
      John F. Butler
      Special Assistant United States Attorney
      Attorney for the United States
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, VA 23510
      Office Number: 757-441-6331
      Facsimile Number: 757-441-6689
      john.f.butler@usdoj.gov